OPINION OF THE COURT
Lucy Billings, J.
Petitioners in these proceedings challenge the prevailing wage schedules that the New York City Comptroller set for roadbuilders and pavers employed in public works projects in the city during fiscal years 2011, 2012, and 2013. Since petitioners’ third, most recent petition incorporates the petitions and the supporting affidavits and exhibits in the two previous proceedings, this decision addresses all three petitions, but cites principally to the record in the third proceeding.
I, Background
A. The Prevailing Wage Laws
Contractors engaged in public projects are required to pay their workers “the rate of wages prevailing in the same trade or occupation in the locality within the state where such public work is to be situated, erected or used.” (NY Const, art I, § 17.) In accordance with this constitutional mandate, public works contractors must pay their workers “not less than the prevailing rate ... in the same trade or occupation in the locality within the state where such public work . . . is to be situated, erected or used” (Labor Law § 220 [3] [a]), and “supplements ... in accordance with the prevailing practices in the locality.” (Labor Law § 220 [3] [b]; see Matter of Lantry v State of New York, 6 NY3d 49, 54 [2005]; Matter of Chesterfield Assoc. v New York State Dept. of Labor, 4 NY3d 597, 599-600 [2005].) Re *481 spondent Comptroller is responsible for classifying work into a specified trade or occupation and determining its prevailing wage, set by the collective bargaining agreements of labor unions and employers employing at least 30% of workers, laborers, or mechanics in the same trade or occupation in the city. (Labor Law § 220 [3-a] [a] [i]; [5] [a], [e]; Lantry v State of New York, 6 NY3d at 54-55; Matter of Metropolitan Movers Assn., Inc. v Liu, 95 AD3d 596, 599 [1st Dept 2012]; Matter of General Elec. Co. v New York State Dept. of Labor, 154 AD2d 117, 119 [3d Dept 1990], affd 76 NY2d 946 [1990].)
B. Undisputed Facts
The Comptroller initiated a reclassification of the previously separate classifications of asphalt pavers and concrete pavers into a single trade of paver and roadbuilder-laborer for fiscal year 2011, running from July 1, 2010 to June 30, 2011. Within the reclassified trade of paver and roadbuilder, the Comptroller designated two subclassifications, production paving and nonproduction/utility paving, and then set the prevailing wage for this classification and its two subclassifications using the collective bargaining agreement (CBA) between respondents Highway and Street Laborers Local Union 1010 and General Contractors Association of New York (GCA). The Comptroller readopted this new trade classification of paver and roadbuilder and prevailing wage schedule for this classification in fiscal years 2012 and 2013, effective from July 1 of the year through June 30 of the following year.
II. Petitioners’ Standing to Maintain Their Challenge
Petitioners may challenge respondent Comptroller’s trade classification (1) as violative of New York Constitution, article I, § 17, or Labor Law § 220 (5) (a)’s requirement that the prevailing wage be set according to the CBA of employers employing 30% of the employees in the trade or (2) as arbitrary, irrational, and without a factual basis. (CPLR 7803 [3].) Petitioners are a labor union, Local 175, United Plant and Production Workers, and New York Independent Contractors Alliance (NYICA), an association of employers employing Local 175 members, whose CBA the Comptroller did not use to set prevailing wages in fiscal years 2011, 2012, and 2013.
Petitioners challenge respondent Comptroller’s determination of the prevailing wages for the trade of roadbuilding and paving, which the Comptroller based on the CBA between respondent unions and the employer members of respondent *482 GCA. Petitioners contend that the Comptroller’s classification, which combined the previously separated trades of asphalt paving and concrete paving into a single trade of roadbuilding and paving, with subclassifications of production paving and utility paving, as not reflecting the different nature of paving work when using asphalt versus concrete. (Lantry v State of New York, 6 NY3d at 55.) Petitioners further claim that, if the work was not misclassified, the CBA of respondent unions and employers would not cover 30% of the workers, laborers, and mechanics in the asphalt paving trade, but petitioners’ CBA would.
Petitioner union and its members maintain an interest in nullifying the newly created paver and roadbuilder-laborer classification and reclassifying the affected workers because this new classification has placed workers performing asphalt paving for each NYICA contractor under a CBA with Local 175 at a substantial competitive disadvantage. NYICA members are injured because prevailing wages are set too low, causing these employers to lose public projects to other employers paying the lower prevailing wages than NYICA members, and causing their employees to lose these jobs as well.
Petitioners thus allege tangible injury and threat of injury from respondent Comptroller’s challenged actions. (New York State Assn. of Nurse Anesthetists v Novello, 2 NY3d 207, 214-215 [2004]; Matter of Troeller v New York City Dept. of Educ., 107 AD3d 507, 507 [1st Dept 2013]; Roberts v Health & Hosps. Corp., 87 AD3d 311, 319 [1st Dept 2011].) In reply to respondents’ answers raising petitioners’ lack of standing as a defense, moreover, petitioners pinpoint concrete examples of their members losing public work, illustrative of a cognizable harm due to respondent Comptroller’s new classification and prevailing wage determination. (E.g. Matter of Association for a Better Long Is., Inc. v New York State Dept. of Envtl. Conservation, 23 NY3d 1, 7-8 [2014]; Troeller v New York City Dept. of Educ., 107 AD3d at 507; Matter of New York Propane Gas Assn. v New York State Dept. of State, 17 AD3d 915, 917 [3d Dept 2005].)
In particular, NYICA member A.S.C. Contracting Corporation’s president attests that the new classification and prevailing wages disadvantaged A.S.C. Contracting in competing for public projects, because, if it hires petitioner Local 175’s workers, it must pay them higher wages under its CBA with Local 175 than other contractors who pay the Comptroller’s lower prevailing wages. These higher costs have caused A.S.C. *483 Contracting’s bid to lose projects at Public School (P.S.) 333Q, P.S. 48Q, P.S. 56R, and P.S. 135K. (Petitioners’ reply affs; aff of Charles Romano f 6.) If A.S.C. Contracting hires the predominant union members from respondent Local 1010, paying them only the prevailing wages, as A.S.C. Contracting did to work for a contractor affiliated with GCA on a P.S. 171M project, A.S.C. Contracting still incurs higher labor costs in paying double benefits to Local 1010 members as well as to Local 175 under its CBA. (Id. f 7.)
The president of NYICA member Nico Asphalt Paving, Inc., similarly attests to its higher labor costs from the Comptroller’s challenged actions as a primary reason why Nico Asphalt Paving unsuccessfully bid for public projects, including the Delphi NYC Department of Environmental Protection Pollution Control Plants, Staten Island School Construction Authority projects, and Metropolitan Transportation Authority (MTA) Bus System projects in New York and Bronx Counties. (Id.; aff of Michael Pietranico 6.) Because the Comptroller has recognized Local 1010 as the predominant union, whose CBA is with GCA, Nico Asphalt Paving, as a member of NYICA, whose CBA is with Local 175, either must pay higher wages than competing contractors that are not NYICA members or must hire Local 1010 members and pay double benefits to work as a subcontractor on public projects won by GCA members’ bids. Therefore Nico Asphalt Paving paid those double benefits, for example, to work on the Prude Construction MTA Bus Project at First Avenue between East 34th and 35th Streets in New York County. (Id. ^ 7.)
The presidents of other NYICA members, Green Gold Development Corp. and Testani Paving Company, Inc., for example, likewise attest that, to work on public projects, the contractors paid double benefits to Local 1010 members whom the contractors hired due to Local 1010’s status as the predominant union. (Id.; aff of Alfonso Taibi 1 7; aff of Gerard Testani f 7.) Again, these examples illustrate the concrete harm caused by respondent Comptroller’s trade classification and designation of Local 1010 as the predominant union for purposes of determining prevailing wages in the trade.
In turn, petitioner union employee members are losing work because their union employers have been underbid on public projects and because, to obtain public project work, the employees must accept the prevailing wages set by the Comptroller under his new trade classification, which are lower than *484 their union employers pay. Local 175 union employee members’ NYICA employers hiring Local 1010 members to perform public work, as attested to above, places petitioner employees at a further competitive disadvantage in obtaining work. (Association for a Better Long Is., Inc. v New York State Dept. of Envtl. Conservation, 23 NY3d at 7-8; Troeller v New York City Dept. of Educ., 107 AD3d at 507.)
In sum, both the members of petitioner employers’ association, NYICA, and the employee members of petitioner union, Local 175, establish their individual standing and hence their organizations’ standing by showing that the prevailing wage determination has injured them. (New York State Assn. of Nurse Anesthetists v Novello, 2 NY3d at 211; Troeller v New York City Dept. of Educ., 107 AD3d at 507; Mulgrew v Board of Educ. of the City School Dist. of the City of N.Y., 75 AD3d 412, 413 [1st Dept 2010]; Uhlfelder v Weinshall, 47 AD3d 169, 181 [1st Dept 2007].) Because their interest in reclassifying their asphalt paving work into a discrete trade is fully consistent with the interests protected by New York Constitution, article I, § 17, and Labor Law § 220 (3), petitioner organizations establish standing to pursue these proceedings; NYICA under Labor Law § 220 (6), and Local 175 under the state constitutional guarantee. (See New York State Assn. of Nurse Anesthetists v Novello, 2 NY3d at 211; Troeller v New York City Dept. of Educ., 107 AD3d at 507-508; Mulgrew v Board of Educ. of the City School Dist. of the City of N.Y., 75 AD3d at 413.)
III. Respondent Comptroller’s Challenged Trade Classification
Labor Law § 220 neither requires nor provides a specific procedure for the Comptroller, in classifying a trade, to evaluate work practices, the types of workers, and the tasks performed (Lantry v State of New York, 6 NY3d at 55), but, at minimum, trade classification does depend on the nature of the work performed. (Id. at 56-57; Metropolitan Movers Assn., Inc. v Liu, 95 AD3d at 598.) Given the Comptroller’s expertise on this subject, his determination may be overturned only if it is unreasonable and without regard to the facts. (Lantry v State of New York, 6 NY3d at 55-56; Metropolitan Movers Assn., Inc. v Liu, 95 AD3d at 598; see Matter of 20 Fifth Ave., LLC v New York State Div. of Hous. & Community Renewal, 109 AD3d 159, 163 [1st Dept 2013].) An administrative agency is required to follow its own precedent, however, so a determination that neither adheres to that precedent nor indicates reasons for *485 reaching a different result on comparable facts is arbitrary. (Matter of Terrace Ct., LLC v New York State Div. of Hous. & Community Renewal, 18 NY3d 446, 453 [2012]; Lantry v State of New York, 6 NY3d at 58; Matter of La Casa Di Arturo Inc. v New York City Dept. of Consumer Affairs, 120 AD3d 1107, 1108 [1st Dept 2014].)
Before respondent Comptroller’s new trade classification on July 1, 2010, the prevailing wages for the separate trade classification of asphalt paver were based on GCA’s CBA with the former Sheet Asphalt Workers Local 1018, before it merged into Local 1010. The prevailing wages for the separate trade classification of concrete paver and roadbuilder were based on GCA’s CBA with Local 1010. The Comptroller claims Local 1010 informed him that in September 2009 Local 1018 had merged into Local 1010 and that the separate trade classifications of asphalt paving and concrete paving were “technically incorrect.” (Aff of Wasyl Kinach 1 11.) Local 1010 urged that the classifications be divided into a trade for production paving and a trade for nonproduction or utility paving. Although the Comptroller followed this urging to the extent of distinguishing between production paving and nonproduction paving, he did not divide them into two trades.
A. The Comptroller’s Trade Classification for 2010-2011
From July 2005 to August 2012, the former Assistant Comptroller, until he left employment by the Comptroller, was responsible for determining trade classifications. From August 2012 to the present, the chief of the Comptroller’s Bureau of Labor Law has assumed this responsibility.
In combining and reclassifying pavers and roadbuilders into a single trade, subdividing it, distinguishing between production and utility paving, and setting the prevailing wage schedules based on the reconstituted Local 1010’s CBA for July 1, 2010 through June 30, 2011, the Comptroller claims he relied on the submissions by Local 1010 and GCA. (Id. M 2, 18-19.) In GCA’s submissions to the Comptroller, GCA distinguished production paving as laying large quantities of asphalt with a paving machine on highways, roads, parks, playgrounds, and airport runways. (Kinach aff, exhibit A; aff of Denise Richardson 1 12.) GCA distinguished nonproduction paving as temporary paving of sites performed manually before production paving and not requiring the same level of skills as production paving. (Id. f 17.) Nonproduction asphalt paving involves temporary or patchwork paving for site safety, which includes *486 digging up and milling old asphalt, and restoration work after sewers, water mains, and other elements of infrastructure have been laid or replaced. (Id. f 16.)
The Comptroller defined the production paving subclassification as asphalt paving only and not concrete paving, when using a paving machine. (Kinach aff f 21.) He defined the nonproduction paving subclassification as construction work in preparation of job sites and removal of old surfaces, “regardless of material used,” including milling, laying concrete, and laying asphalt for temporary, patchwork, and utility paving that is not production paving. (Id. H 22.)
Although the Comptroller insists he determined that distinguishing between working with asphalt and working with concrete does not reflect actual distinctions in the nature of the work performed (Kinach aff f 23), he never explains how he reached such a determination. He never specifies what in the nature of working with asphalt and working with concrete in performing paving and related preparatory work supports reversal of his prior classifications distinguishing between the materials used or why the prior classifications did not reflect distinctions in the nature of the work with the different materials.
Neither the Comptroller nor the submissions from respondent unions and employers’ association before July 1, 2010 claim any changes in the nature of asphalt paving or concrete paving. Although the use of a paving machine as well as manual tools and skills in asphalt paving distinguishes it from concrete paving, which according to the new subclassifications never involves use of a paving machine, no source suggests that that distinction is new, nor provides a reason why that distinction now warrants combining asphalt and concrete paving into a single trade. As for the asphalt paving defined as nonproduction paving, the record the Comptroller relied on in making his determination for 2010-2011 reveals nothing about how the nature of that asphalt paving work, without a paving machine, is similar to concrete paving, to justify their reclassification into the same trade and laborer subclassification.
Although the Comptroller’s expertise in determining trade classifications for purposes of setting prevailing wage schedules is entitled to deference, the Comptroller at least must explain his divergence from his prior trade classifications. (Terrace Ct., LLC v New York State Div. of Hous. & Community Renewal, 18 NY3d at 453; Lantry v State of New York, 6 NY3d at 58; *487 La Casa Di Arturo Inc. v New York City Dept. of Consumer Affairs, 120 AD3d at 1108.) A failure to justify his nonadherence to precedent requires reversal of the change, even if substantial evidence supports the new determination. (Terrace Ct., LLC v New York State Div. of Hous. & Community Renewal, 18 NY3d at 453; Matter of Charles A. Field Delivery Serv. [Roberts], 66 NY2d 516, 520 [1985].) Simply insisting that the prior trade classifications did not reflect the nature of the work, as respondents claim, without any explanation specifying how the nature of the work is similar or how prior distinctions are not based on actual facts, whether work practices, the types of workers, the tasks performed, the skills and tools involved, or other criteria, is conclusory. (See Arner v RREEF Am., L.L.C., 121 AD3d 450, 450 [1st Dept 2014]; Gregor v Rossi, 120 AD3d 447, 448 [1st Dept 2014]; Lansen v SL Green Realty Corp., 103 AD3d 521, 522 [1st Dept 2013].) Instead of explaining any similarities in the nature of asphalt paving and concrete paving or any changes in the work that would justify abandoning the Comptroller’s long used classifications that distinguished between the asphalt and concrete materials used, his determination focuses on a distinction between asphalt paving and concrete paving based on the former’s use of a paving machine. Such a distinction fails to explain combining the work with each type of material into one trade. Absent any sort of explanation for the combined classification, as outlined above or otherwise, his determination is arbitrary. (Matter of La Casa Di Arturo Inc. v New York City Dept. of Consumer Affairs, 120 AD3d 1107, 1108 [1st Dept 2014]; 20 Fifth Ave., LLC v New York State Div. of Hous. & Community Renewal, 109 AD3d at 163, 166; Matter of Langham Mansions, LLC v New York State Div. of Hous. & Community Renewal, 76 AD3d 855, 858 [1st Dept 2010].)
On the other hand, petitioners point to evidence supporting the former separate trade classifications of asphalt paving and concrete paving based on the distinction in materials used. Petitioner Local 175’s business manager who has performed paving work for over 30 years attests that concrete paving, after the subgrade preparatory work has been completed, involves pouring concrete to form the curbs and sidewalks and, after they have cured, paving a concrete base on the roadway using shovels and brooms. (Petitioners’ reply affs; aff of Roland Bedwell *|[ 3.) After the concrete base has cured, asphalt is paved over this base on the roadway by specialized asphalt *488 paving crews. (Id. OT 4-5.) The process is the same for asphalt paving with or without a paving machine. (Id. M 10-11.) Production asphalt paving, with a machine, and nonproduction/ utility asphalt paving, without a machine, require an asphalt raker, tamper, screedperson, and micropaver, none of whose skills is required or interchangeable in concrete paving. (Id.)
B. The Comptroller’s Continued Adoption of the 2010-2011 Trade Classification
Upon petitioners’ continued challenge to the combined classification in 2011-2012, the Comptroller’s delegate decision-maker conducted site visits observing respondent Local 1010 and petitioner Local 175 members performing road construction projects September 14, November 3, and November 4, 2011. The Comptroller claims these observations confirmed the distinction between production and nonproduction/utility paving. (Kinach aff If 34-36.) Once again he neither specifies any differences between production paving and nonproduction paving nor otherwise explains how his observations justify combining asphalt paving and concrete paving into one trade, yet require separating asphalt paving with a machine into a separate subclassification. Without any such elucidation from the Comptroller of reasons supporting his trade reclassification, this court is bereft of any means to determine whether his reversal of his prior trade classifications is rationally based and actually reflects the nature of the work. (See Terrace Ct., LLC v New York State Div. of Hous. & Community Renewal, 18 NY3d at 453; Matter of Zenk Pedicab Rental & Operation, Inc. v New York City Dept. of Consumer Affairs, 116 AD3d 484, 485 [1st Dept 2014].)
The submissions by respondent employers’ association and unions to the Comptroller in May 2011 included affidavits from GCA’s members, Tully Construction Co., Inc., through its general counsel, and William A. Gross Construction Associates, Inc., through its executive, and from an employee member of Local 1010, specifying the work involved in production and nonproduction paving. Construction work involved in surfacing roads and similar paved pathways requires removal and sometimes milling of old pavement, preparing the subbase, and laying new asphalt with a paving machine, which then requires raking, shoveling, and screeding of the asphalt laid. (Kinach aff, exhibit C; aff of Steven Rizzo f 9.) Production paving, commonly referred to as asphalt paving, involves spreading larger quantities of asphalt with a paving machine for permanent or *489 long term use. (Kinach aff, exhibit B; aff of Richard H. Wynn f 9.) These witnesses claim that the removal of the old pavement and preparation of the base, as well as the temporary and patchwork paving using asphalt performed in connection with both nonproduction/utility and production paving, require less skills than paving large quantities of asphalt using a machine. (Id. 1 11; Kinach aff, exhibit D; aff of Joe Sarro f 5.)
Whether these later submissions provide support for the distinction between production and utility paving, as respondent Comptroller claims (Kinach aff f 27), or not, they are not evidence justifying his initial reversal of the prior trade classifications for the years 2010-2011. Nor are they necessarily support for the combination of asphalt paving with concrete paving.
The record sheds no light on the skills required for asphalt paving with a machine and the temporary and patchwork asphalt paving performed in connection with production paving considered by respondents under the production paving subclassification, versus the paving without a machine, using concrete and asphalt, under the nonproduction paving subclassification. Equally glaring is the lack of evidence regarding the nature of the work and skills required for the former trade classification of concrete paving. Nothing reveals whether the nature of this work is similar to the asphalt paving with which concrete paving now is classified as nonproduction paving or whether workers using these two materials and the tools used are sufficiently interchangeable to justify the combined trade classification under paver and roadbuilder-laborers.
Without evidence in the record that this classification actually reflects the nature of the work (Lantry v State of New York, 6 NY3d at 56), any reliance by the Comptroller on the New York State Department of Labor’s prevailing wage schedule for New York City does not demonstrate that the Comptroller formulated his combined trade classification with a sound basis in reason and with regard to the facts. (Metropolitan Movers Assn., Inc. v Liu, 95 AD3d at 598.) While the State Department of Labor’s schedule for New York City covers the same geographical area as the Comptroller’s schedule, the State’s schedule does not reveal how it arrived at its paving and roadbuilding trade classification or whether it considered making any distinction based on the material used. Nor does reliance on the State’s schedule account for the fact that, until 2010-2011, New York City was always the only locality in the *490 state to make that distinction. (Kinach aff f 37.) Finally, even if the State’s schedule or any other evidence in the record supported the Comptroller’s trade classification, his failure to justify revocation of his long-standing precedent distinguishing between asphalt and concrete in the paving and roadbuilding trade classifications, in favor of a subclassification based on the use of a paving machine, requires reversal. (Terrace Ct., LLC v New York State Div. of Hous. & Community Renewal, 18 NY3d at 453; La Casa Di Arturo Inc. v New York City Dept. of Consumer Affairs, 120 AD3d at 1108; 20 Fifth Ave., LLC v New York State Div. of Hous. & Community Renewal, 109 AD3d at 166; see Lantry v State of New York, 6 NY3d at 58.)
IV. The Prevailing Wages
Respondent Comptroller based the prevailing wage schedule from July 1, 2010 through June 30, 2011, for the newly unified classification of paver and roadbuilder-laborer on the CBA of respondent Local 1010, having absorbed the former Local 1018. The Comptroller claims Local 1010 credibly showed that in 2008 its 1,193 members, who traditionally worked in nonproduction/utility paving, combined with the former Local 1018’s 141 members, encompassed more members performing both production and utility paving than petitioner Local 175’s claimed 236 members in its asphalt paving division. (Kinach aff fl 15, 19.) Respondent unions’ subsequent submissions in May 2011 and June 2012, showing that in fiscal year 2011 Local 1010 included over 1,400 members performing concrete and asphalt paving, confirmed a continuation of the combined classification. (Id. 11 26, 30.) The Comptroller also maintains that, even under the formerly separate asphalt and concrete trade classifications for pavers and roadbuilders, Local 1010, with more members than Local 175 working in both asphalt and concrete paving, would be the predominant union for setting the prevailing wages in both classifications in any event. (Id. 140.)
While this contention that Local 1010 predominates even under the former asphalt paving trade classification, as well as under the former concrete paving trade classification, would render the dispute over the trade classification academic, the contention lacks support in the record. (See Matter of L&M Bus Corp. v New York City Dept. of Educ., 17 NY3d 149, 160 [2011]; Metropolitan Movers Assn., Inc. v Liu, 95 AD3d at 598-599; Matter of Diaz v Wing, 302 AD2d 201, 203 [1st Dept 2003].) *491 Neither respondent Comptroller nor the submissions by respondent unions and employers’ association set forth the breakdown of Local 1010’s employee members who work in production asphalt paving with a machine, who work in nonproduction/utility paving with asphalt, and who work in concrete paving. Without such data, it is impossible to ascertain whether Local 1010 members perform more asphalt paving than petitioner Local 175’s claimed 236 members who perform asphalt paving.
For purposes of showing whether Local 1010 is the predominant union under either the new classification or the old ones were they continued, the record is replete with documents indicating that respondent GCA’s members are the largest unionized public works contractors. These documents include a list of GCA’s employer members, the total monetary amount of bids these members won, and the total person-hours of work in various types of paving and roadbuilding respondent union employees performed. The documentary evidence does not show, however, the basic facts of how many Local 1010 members engaged in production and nonproduction/utility paving. Even accepting respondents’ contention that Local 1010 includes more members than petitioner Local 175 working in the combined single trade classification of paver and roadbuilder, both petitioners’ and respondents’ preoccupation with which union is predominant in total number ignores the statutory mandate. Labor Law § 220 (5) (a) requires only that the prevailing wage be determined by the CBA of employers employing at least 30% of workers in the trade. (Lantry v State of New York, 6 NY3d at 54-55; Metropolitan Movers Assn., Inc. v Liu, 95 AD3d at 598.)
Respondent unions and employers’ association claim “it is apparent that Local 1010 represented workers make up at least 30% of workers who do asphalt and concrete surfacing work” solely because the number of workers this union represents far exceeds the number petitioner Local 175 represents. (Kinach aff, exhibit B; aff of Francisco Fernandez f 7.) Yet Local 1010 admits it does not know the total number of nonunion workers or workers in unions other than petitioner and respondent unions engaged in asphalt and concrete surfacing work in New York City. (Id. ) Without that information or at least a showing that petitioner and respondent unions represent nearly all workers engaged in this work, any claim that a union represents at least 30% of workers in the trade is unsubstantiated.
*492 Whether a particular union predominates in total number of workers might be a corollary to, but is not direct evidence of, the union’s employee members meeting the 30% requirement. A union may represent at least 30% of workers in the paver and roadbuilder trade without being the predominant union in total number representing these workers in New York City. For the same reason, petitioner Local 175’s insistence that Local 175 represents more asphalt workers than Local 1010 does not require the Comptroller to adopt Local 175’s CBA as the prevailing wages for an asphalt paving trade classification. It may be that Local 1010 represented at least 30% of workers, whether under the prior trade classifications or under the current classification. As set forth above, however, absent any showing by respondents of the total number of workers engaged in paving and roadbuilding in this locality, respondents’ claim that GCA’s CBA with Local 1010 meets the 30% statutory mandate lacks support in this record and is therefore only speculative.
V. Disposition
For the reasons explained above, the court grants the petition to the extent of annulling respondent Comptroller’s trade classification of paver and roadbuilder-laborer and its prevailing wage schedule for the fiscal years 2010-2011, 2011-2012, and 2012-2013. The court remands the proceeding to the Comptroller to formulate a factually and rationally based trade classification and prevailing wage schedule that comports with Labor Law § 220 (5). (CPLR 7806.)